UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**VERONICA CANAZAS,**

Plaintiff,

v.                                                    CIVIL NO. 3:11cv33-JRS

**ACXIOM CORPORATION, ACXIOM
INFORMATION SECURITY SERVICES
and TRANS UNION, LLC**

Defendant.

## PLAINTIFF'S 26(A)(2) EXPERT WITNESS DISCLOSURE AND DESIGNATION

COMES NOW the Plaintiff, **VERONICA CANAZAS**, by counsel, and discloses the

following Expert Witness to testify at trial:

Evan D. Hendricks
P.O. Box 302
Cabin John, MD 20818
(301) 229 7002 - Telephone

The opinions, qualifications, basis for the opinions and other disclosures required by

F.R.C.P. 26(a)(2) are contained in the Plaintiff's Rule 26(a)(2) Expert Witness Report attached to

this Designation.

Respectfully submitted,

**VERONICA CANAZAS**

_____/s/_____
Leonard A. Bennett, Esq.
VSB #37523
Attorney for Plaintiff
CONSUMER LITIGATION ASSOCIATES, P.C.
12515 Warwick Boulevard, Suite 100
Newport News, Virginia 23606
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
lenbennett@cox.net

Dale Wood Pittman
The Law Office of Dale W. Pittman, P.C.
112-A W Tabb St
Petersburg, VA 23803-3212
(804) 861-6000  - Telephone
(804) 861-3368 - Facsimile
Email: dale@pittmanlawoffice.com

Kristi Cahoon Kelly
Surovell Isaacs Petersen & Levy PLC
4010 University Dr
Suite 200
Fairfax, VA 22030
703-277-9774 - Telephone
703-591-2149 – Facsimile
Email: kkelly@smillaw.com

### *CERTIFICATE OF SERVICE*

I hereby certify that on this 10th day of  August, 2011,  I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

David N. Anthony
Troutman Sanders, LLP
Troutman Sanders Building
1001 Haxall Point
P.O. Box 1122
Richmond, VA  23218-1122
E-mail: david.anthony@troutmansanders.com

   *Counsel for Acxiom*

Grant E. Kronenberg
Morris & Morris, PC
700 East Main Street
Suite 1100
P.O. Box 30
Richmond, VA  23218
E-mail:  gkronenberg@morrismorris.com

Martin Ellis Thornthwaite
Strasburger & Price LLP
2801 Network Blvd
Suite 600
Frisco, TX 75034
Email: martin.thornthwaite@strasburger.com

     *Counsel for Trans Union*


                                            _____/s/_____

                                            Leonard A. Bennett, Esq.
                                            VSB #37523
                                            Attorney for Plaintiff
                                            CONSUMER LITIGATION
                                            ASSOCIATES, P.C.
                                            12515 Warwick Boulevard, Suite 100
                                            Newport News, Virginia 23606
                                            (757) 930-3660 - Telephone
                                            (757) 930-3662 – Facsimile
                                            lenbennett@cox.net

## PLAINTIFFS' RULE 26(a)(2) EXPERT WITNESS REPORT OF EVAN HENDRICKS

I, Evan Hendricks, provide the following Expert Report in connection with the action entitled <u>Veronica Canazas v. Acxiom Corporation, TransUnion, et al.</u>: U.S. District Court for the Eastern District of Virginia (No. 3:11cv33-JRS). **Part 1** of this report addresses issues that are specific to this case, including a history that robustly put the Defendants on notice of the problems in this case and why the Defendants should have prevented them. **Part 2** includes my qualifications, list of prior cases in which I have testified, my fee, and more general opinions, such as the nature and purpose of credit scores and credit reports, and damages. If Defendants disclose additional evidence after I have completed this expert report, and if appropriate, I reserve the right to supplement this report at a future date.

### Opinions

- One of the most well-known and long-standing causes of credit report inaccuracy is the "mixed file." A "Mixed File" is a "Consumer Report in which some or all of the information pertains to a person or persons other than the person who is the subject of the Consumer Report." Sometimes the cause of a Mixed File is a "multiple file."

- Another well-known and long-standing cause of credit report inaccuracy is identity theft. Identity theft is a subcomponent of a "Mixed File" because the Consumer Report of the innocent victim includes information that "pertains to a person or persons (i.e. the fraudster) other than the person who is the subject of the Consumer Report."

- Veronica Canazas' ("Plaintiff") case had several telltale signs of a mixed and/or multiple file. For starters, TransUnion (TU) and Acxiom knew that there was more than one Ms. Canazas and that there was a different Social Security number ("SSN") and a different date of birth ("DOB") for at each of them. The wrongful mixing meant that the derogatory accounts belonging to the other Ms. Canazas ("OMC"), some of which were opened when Plaintiff was a child, were included in reports that were sold to prospective employers, creditors and insurers.

- While it's not clear yet precisely how and why Plaintiff became mixed with OMC, some important causes of this were the defects in TU's and Acxiom's methods of "partial matching." While I await the results of discovery before expressing my opinions more authoritatively, it appears quite possible that TU's partial matching caused highly damaging information to be included in Plaintiff's reports that were sold to prospective employers and creditors, and which then triggered a highly damaging sequence of events that more solidly merged Plaintiff with OMC.

- Accordingly, TransUnion and Acxiom lacked adequate mechanisms for preventing the wrongful mixing of information pertaining to OMC into Plaintiff's

file. These failures at least in part were caused by defects in TU's and Acxiom's methods of "partial matching."

- While I await the results of discovery for confirmation, it appears likely that at least some, if not most, of the original creditors and collectors began targeting Plaintiff because of information they bought from TU.

- While I await the results of discovery for confirmation, it appears that defects in TU's partial matching caused TU, on the one hand, to disclose a very "thin" file to Plaintiff upon her request, but to sell a report chock full of derogatory data when TU received an inquiry from a subscriber.

- While I await the results of discovery for confirmation, it appears that defects in TU's partial matching played an important role in TU _not_ discovering in its own files the information disputed by Plaintiff that it had previously sold.

- Because of the hurried, conveyer-belt-styled environment in which TU conducts the ACDV-exchange, TU did not consider Plaintiff's disputes with sufficient care. Accordingly, it mis-diagnosed the disputes as coming from a possible "credit repair clinic," as opposed to recognizing that her disputes contained very helpful information that should have enabled TU to resolve the disputes expeditiously. This greatly compounded the damage to Plaintiff.    This also meant that TU did not bother to take investigative steps that would have been logically calculated to determine the underlying truth of the disputed data.

- Since the early 1990s, because of federal and state enforcement actions, TransUnion was well aware that its standard practices and procedures too often permitted mixed files. From the same history, TU knew or should have known that its principle method for responding to consumer disputes was in too many instances inadequate to resolve them satisfactorily. Yet TU failed to adhere to the spirit of consent agreements and therefore did not make the changes necessary to avoid the predictable recurrence of mixed files and inadequate reinvestigations that are prominent in Plaintiff's case.

- The derogatory data that in fact were generated by another consumer and were very damaging to Plaintiff's creditworthiness. The wrongful mixing of Plaintiff's data, which in turn caused the wrongful disclosure of her sensitive personal data, also caused damage to Plaintiff's privacy.

- Due to various developments, Defendants TransUnion and Acxiom knew or should have known that mixed files were damaging to victims for several reasons.

- It is well known that collectors such as those in this case can fail to exercise a sufficiently high degree of care after receiving ACDVs from CRAs such as TransUnion.

2

- Given that TU's knows that its long-standing practices continue both to cause files to mix in a manner that systematically causes inaccuracies, and to perpetuate mixed files, its decision not to make significant changes in these problematic practices reflect TU's belief that it will make more revenue by sticking with its long-standing practices, in my opinion. TU resistance to change reflects its view that it is more beneficial to continue long-standing practices, in spite of compelling evidence of the damage and problems they cause consumers.

- It is well known in our field that victims of chronic credit report inaccuracy endure a common pattern of harms. The damages suffered by plaintiff were consistent with those experienced by other victims.

- Another well-known and long-standing cause of credit report inaccuracy is the furnishing of erroneous data by furnishers.

- It was because of this well-known phenomenon that Congress in 1996 amended the Fair Credit Reporting Act (FCRA) to (1) impose a duty on furnishers to avoid furnishing inaccurate information, and (2) upon receiving disputes directly from consumers to furnish account data to consumer reporting agencies (CRAs) with the notation "disputed by consumer;" and (3) conduct investigations upon receiving consumer disputes from CRAs; and (4) create a private right of action for consumers when furnishers failed # (3).

- It is well known that credit reporting is a "powerful tool designed, in part, to wrench compliance with payment terms." (Rivera v. Bank One, 145 F.R.D. 64, 623 (D.P.R. 1993)). When a consumer applies for a mortgage, or other major form of credit, the mortgage or credit often is not granted until all outstanding unpaid debts listed on the credit report are resolved. Thus, a creditor that is owed money, or that still hopes to collect money whether or not it is actually owed by the consumer, enhances its ability to garner payment by reporting the debt to that consumer's credit report. This practice his highly problematic and damaging to the consumer when the consumer, as was the case for Plaintiff, does not in fact actually owe the amount being reported to her credit report. TU is aware of these problems.

## TU Lacked Mechanism For Blocking Suspect Data

TU knew there were important discrepancies between Plaintiff's and OMC's identifiers. Regardless, TU allowed OMC's derogatory information to be mixed into Plaintiff's file because of defects in TransUnion's (TU) approach to "partial matching." (See discussion on partial matching, and on the "History of Inaccuracy," including discussion on the consent agreement between TU and FCRA enforcement offices.)

3

Given the long history of mixed files and the damage it can inflict on consumers, TU should have had in place a mechanism for blocking data that was obviously suspect. An even greater failure on TU's part occurred after Plaintiff disputed errors in her file, thus informing TU that the "indicative data" (i.e., identifiers) regarding OMC was causing the wrongful merging of data OMC generated into Plaintiff's file. Despite this important, particularized notice, TU nonetheless failed to put in place a mechanism to prevent future mixing of their data. Given the history and context, this failure was reckless, in my opinion.

Given the specialized knowledge that I have thus far gained about TU's approach to partial matching, it seems likely, in my opinion, that the "name match," combined with a geographic similarity – Virginia – were important factors in the merging/mixing of Plaintiff and OMC.

### Context: Mixed Files and Partial Matching

In the consent agreement between TU and the State AGs discussed below, TU agreed to use "full identifying information," defined as "full last and first name; middle initial; full street address; zip code, year of birth; any generational designation; and social security number."

TU has testified in other cases that despite this agreement, it, like other CRAs, uses partial matching algorithms, which caused many problems in Plaintiff's case.

### Why did this mixed file happen, and why do mixed files at TU continue to occur?

Given that TU knows that its long-standing practices continue both to cause files to mix in a manner that systematically causes inaccuracies, and to perpetuate mixed files, its decision not to make significant changes in these problematic practices reflect TU's belief that it will make more revenue by sticking with its long-standing practices, in my opinion.

TU's revenues are based in large part on volume. The more credit reports it sells, the more money it makes. Accordingly, TU favors practices that maximize the number of reports it can sell, and disfavors policies or practices that might interfere with this goal. As this case highlights, the problem is that TU's policies, practices and pursuit of this goal clash with the FCRA's goal of maximum possible accuracy and TU's duty to adopt procedures to achieve that goal.

To maximize the possibility that it will have a credit report available for sale when a creditor inquires, TU, designs its system so defaults towards "inclusiveness." That is, to ensure that it will have a credit report available for sale when a creditor inquires, TU's matching algorithms are designed to pull together any possible information that might relate to that consumer.

What will be interesting to learn is whether and, if so, how many of the original creditors and collectors began targeting Plaintiff because of information they bought from TU.

If TU would have followed the consent decree, and relied upon full identifying information, then it could have prevented this from happening.

### TU's Response To Plaintiff's Disputes

It is important to understand that TU has designed its systems with great deference to the interests of its paying customers, the creditors/users. In this case, TU ultimately sheltered furnishers from some liability by failing its own duty to send Plaintiff's disputes to them.

In my opinion, when Plaintiff disputed the inaccuracies that TU had sold about her, the TU operator only searched TU's system corresponding to Plaintiff's name and SSN, and possibly address. Because of TU's defects, TU did not search according to the criteria used to decide what report was sold about Plaintiff to subscribers. Therefore, TU wrongly concluded that the disputed data was not in Plaintiff's file. Considering the details in Plaintiff's dispute letter, and the context, this failure was a result of reckless disregard.

One of the factors influencing this outcome was the hurried, conveyer-belt-styled environment in which TU conducts the ACDV-exchange. Because of this environment, TU did not consider Plaintiff's disputes with sufficient care. Accordingly, it mis-diagnosed the disputes as coming from a possible "credit repair clinic," as opposed to recognizing that her disputes contained very helpful information that should have enabled TU to resolve the disputes expeditiously. This greatly compounded the damage to Plaintiff. This also meant that TU failed its own duty to send Plaintiff's disputes to furnishers, and that TU did not bother to take investigative steps that would have been logically calculated to determine the underlying truth of the disputed data.

### TransUnion, Furnishers & The 'ACDV Exchange'

TransUnion has constructed a system for responding to consumer disputes that comports with its goals of deferring to furnishers' wishes.

CRAs like TransUnion, and furnishers, such as those in this case, rely on the ACDV-exchange as their principal means of responding to a consumer's dispute. As all three CRAs and many furnishers are well aware, I have been critical that they sometimes over-rely on the ACDV exchange for disputes such as mixed files that require careful consideration, analysis or true investigation in order to be resolved satisfactorily.

The ACDV-exchange is inadequate for many disputes requiring careful consideration because it essentially consists of an exchange of messages known as "Automated Consumer Dispute Verifications" (ACDVs). When the consumer sends his dispute to the CRA, the CRA populates the ACDV form with his identifying information (name, address, city-state-zip, SSN, sometimes previous address),[1] and a two-or three-digit, or alpha-numeric code that cryptically

---

describes the dispute (e.g., "not mine" or "fraud"). In a "not mine," as well as other types of disputes, the CDV instructs the furnisher to provide "complete ID."

Upon receipt of the CDV form, the furnisher will advise the CRA if a sufficient number of identifiers (i.e., name, Social Security number) match up and then "instruct" the CRA to either delete, modify, or "verify" the information so that it remains.

Thus, this process is better described as a ***comparison*** of each entity's existing data on the consumer, rather than an independent evaluation or investigation of the consumer's dispute.

As this case illustrates, there can be several problems with the ACDV-exchange serving as the principal means of responding to consumer disputes. First, a cursory exchange of messages does not amount to an investigation under any normal sense of the word. The Webster's New Collegiate Dictionary defines "investigate" as, "v. To observe or study by close examination and systematic inquiry. Systematic—adj. Marked by thoroughness and regularity." An exchange of messages is neither a "study by close examination" nor "marked by thoroughness and regularity," in my opinion.

The main problem in Plaintiff's case was that TU failed to carefully consider her disputes, which were full of important details that should have enabled TU to resolve the dispute expeditiously.

If TU would have followed the consent decree, and – relied upon full identifying information, and assigned to Plaintiff's case a senior investigator specialized in Mixed Files, who then "pull(ed) all files which may be involved in the dispute; 2) fully verify disputed tradelines to determine whether the tradeline is owned by the Consumer in whose file it resides; 3) make any changes, deletions, or additions to correct the Consumer's file and resolve the dispute; and 4) for files which are found to be mixed, prepare a summary and hard copies of the files involved to the systems support division of the Data Processing Department, for review and analysis by that Department as to the need for corrective action" – then Plaintiff's dispute would have been resolved easily and expeditiously, and this lawsuit could have been avoided, in my opinion. But this case illustrates that TU too often fails to implement what it promised the FTC and State AGs that it would, and too often fails to recognize how its routine practices can cause chronic inaccuracy and seriously damage innocent victims, and fails to consistently implement obviously needed changes.

**TU Did Not Forward All Relevant Information, Mischaracterized The Dispute**

As a result, TU failed to provide furnishers with all relevant information regarding Plaintiff's disputes. For example, Plaintiff attached her driver's license, and/or Social Security card to some of her disputes.

**Absent Litigation, Errors Would Have Persisted Indefinitely**

Ironically, TU's persistent failure to correct the chronic inaccuracies in Plaintiff's TU credit file would have persisted indefinitely had Plaintiff not discovered the possible misuse of her SSN and filed fraud affidavits with TU. The filing of the fraud affidavit finally prompted a more experience investigator to examine her dispute and give it more careful consideration. The fraud affidavit process is supported by TU's FACT Act-compliant policy of removing disputed tradelines that are identified in fraud affidavits.

But this case illustrates how TU's system can prove inadequate to resolve mixed files disputes. Considering that the issue was dealt comprehensively some 17 years ago, and TU pledged to the State AGs and FTC to do a better job, TU's failures here were reckless, in my opinion.

Unless some new dynamic is introduced into TransUnion's world view, TU will continue to harm consumers by (1) overly relying on the ACDV-exchange instead of turning to alternative investigate techniques when needed; failing to cross-check suspect information in order to prevent it from entering the consumer's file in the first place; and (2) failing to remove disputed, inaccurate information and (3) permitting its approach to partial matching to wrongly mix consumers before and after their disputes.

**Context**

Context is extremely important in this type of case, in part because credit reporting, along with inaccuracies stemming from CRA and furnisher practices and policies, mixed files or identity theft, are a long-standing and well-known problems. An important role of experts in FCRA cases is to help the trier of fact understand the relevant context.[2] Accordingly, I provide a brief history. An important theme emerging from this history is that consumer reporting agencies (CRAs) like Defendant TransUnion (TU) and Experian were consistently provided notice in one form or another of the importance of ensuring the accuracy of information it reports and promptly restoring accuracy when the consumer disputes inaccuracies. This history also notified TU and Experian of the potential damage to consumers of reporting erroneous information and failing to correct it.

---

[2] Kirkpatrick v. Equifax, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO; In rejecting Defendant Equifax's motion to exclude Mr. Hendricks' testimony, Judge Michael W. Mosman, ruling from the bench, stated: "As a general statement, what I'm allowing and the reason I'm allowing it is testimony that puts the particular actions of the defendant in particular here in context, in the context of the nationwide problem of identity theft, in the context of the congressional reaction to that and other issues in the credit-reporting industry, when he can by virtue of his study and his prior testimony, both in court and to Congress, make comparisons, then that's something that's helpful to the jury." (January 18, 2005; Transcript available upon request.)

## History of Significant Inaccuracy Problems

It is essential that the trier of fact understand that there is a long-standing problem of significant inaccuracy rates in credit reporting data. Since 1990, several non-industry studies have concluded that credit report inaccuracy is a problem of significant proportions that can have a major negative impact on the victims of inaccuracy, and that can potentially be detrimental to the credit system as well.[3]  This history is covered in Chapter 10 of my book, "Credit Scores and Credit Reports." As that Chapter notes, in the early 1990s, problems with inaccuracy and "mixed files," CRA non-responsiveness and inadequate reinvestigations became the cause of complaints to the FTC.

Of particular note was the 1993 study done by the U.S. Public Interest Research Group (US PIRG), "Public Enemy #1 At The FTC." Based upon a Freedom of Information Act request, the 1993 report found that between 1990-93, problems with credit bureaus was the leading cause of complaints to the FTC (30,901, 20.6%). The 1993 PIRG found that 44% of

---

[3] Williams, James (CIS), "Credit File Errors, A Report," August 7, 1989 -- The first survey of 1,500 consumer reports and found serious error rate of 42% to 47%;

Consumers Union, "What Are They Saying About Me? The Results of A review of 161 Credit Reports From The Three Major Credit Bureaus, April 29, 1991 -- 48% contained "serious errors," defined as meaning those that could, or did, cause the denial of credit, employment or insurance.

U.S. Public Interest Research Group (US PIRG), "Nightmare On Credit Street (Or How The Credit Bureau Ruined My Life): Case Studies Documenting Consumer Complaints and Recommendation For Amending the FCRA," June 12, 1990

U.S. Public Interest Research Group (US PIRG), "Don't Call; Don't Write; We Don't Care." 1991 -- Review of 156 consumer report complaints on file at the FTC revealed that the average duration of complaints against a CRA was 22.5 weeks, or almost 6 months

U.S. Public Interest Research Group (US PIRG), "Public Enemy #1 At The FTC " October 1993, Based upon a Freedom of Information Act request, the 1993 report found that between 1990-93, problems with credit bureaus was the leading cause of complaints to the FTC (30,901, 20.6%). The 1993 PIRG found that 44% of complaints concerned mixed files, and that among those, 64% involved the mixing of data with total strangers.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: Credit Report Errors Mean Consumers Lose," March 1998

"Credit Reports: How Do Potential Lenders See You?" *ConsumerReports.org*, July 2000.

Consumer Federation of America and National Credit Reporting Association, *Credit Score Accuracy and Implications for Consumers*, December 2002.

Robert Avery, Paul Calem, Glenn Canner, and Raphael Bostic, "An Overview of Consumer Data and Credit Reporting," *Federal Reserve Bulletin*, February 2003.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: A Look at Credit Report Errors," June 2004

complaints concerned mixed files, and that among those, 64% involved the mixing of data with total strangers.

These and other complaints prompted the FCRA's oversight authorities – the FTC and State Attorneys General – to launch investigations and take enforcement actions. These actions resulted in a series of separate consent decrees involving Equifax, Experian and Trans Union in which each pledged to do a better job of maintaining accuracy, avoiding mixed files and the reappearance of previously deleted data, being more responsive and conducting adequate reinvestigations.

On October 26, 1992, TransUnion signed a "Consent Order" with 18 State Attorneys General (AGs).

The first problem identified by the 1992 State AG Agreement was the need to avoid the occurrence or reoccurrence of mixed files. The Agreement defined "Mixed File" as a ***"Consumer Report in which some or all of the information pertains to a person or persons other than the person who is the subject of the Consumer Report."*** The 1994 FTC Consent Order's definition of Mixed File was identical. The Agreement also emphasized the importance of using "full identifying information," defined as "full last and first name; middle initial; full street address; zip code, year of birth; any generational designation; and social security number."

Moreover, in the 1992 agreement with the State Attorneys General, Trans Union agreed to adhere to the following practices:

iv.   Upon receipt or documentation from the Consumer which Trans Union determines is reliable and/or authentic and which supports the Consumer's version of the disputes information, correcting or deleting the dispute item...

v.    As to Consumer disputes concerning Mixed Files, assigning such disputes, for investigation and resolution, to Senior Investigators who are experienced in handling such disputes. In such cases the Investigator shall, as appropriate: 1) pull all files which may be involved in the dispute; 2) fully verify disputed tradelines to determine whether the tradeline is owned by the Consumer in whose file it resides; 3) make any changes, deletions, or additions to correct the Consumer's file and resolve the dispute; and 4) for files which are found to be mixed, prepare a summary and hard copies of the files involved to the systems support division of the Data Processing Department, for review and analysis by that Department as to the need for corrective action...

Finally, the agreement defined "Derogatory Information," as

... Information in a Consumer Report or File indicating a bankruptcy adjustment plan, bankruptcy, liquidation, reorganization, charge off, collection account, charge off now

9

paying, deed in lieu of foreclosure, foreclosure proceedings,
government claim, late payment, paid by dealer, paid charge off,
paid collection account, paid foreclosure, paid repossession,
repossession, judgment or tax lien.

### History: Increased Attention on Role of Furnisher

This Consent Agreements are relevant because (1) they created widespread publicity about the problems of credit report inaccuracy, (2) they articulated (an agreed upon) higher and more specific standard of care to ensure accuracy and fairness, and (3) they formed the foundation for the 1996 Amendments to the FCRA. However, Congress knew that to ensure accuracy, it needed to go beyond the Consent Agreements by placing duties on furnishers to report information accurately.

The April 1994 House Banking Committee Report on the proposed amendments explained why, despite the consent agreements, and subsequent industry guidelines, legislation was necessary: "Moreover, because the industry guidelines are simply voluntary, they are unenforceable and may be changed or revoked at any time. Many of the provisions in the consent agreements expire after a short period of time, are not enforceable by consumers, and do not apply in every state. *Additionally, these agreements do not impose any reinvestigation obligations on furnishers of information or on credit bureaus other than the three largest. Because of these limitations, federal legislation is necessary to improve accuracy-related protections for consumers. Consequently, the bill contains new reinvestigation procedures which are intended to cut down on the number of errors in consumer reports and to reduce the delay in correcting those errors.*" [Emphasis Added]

Importantly, the Consent Agreements' language on preventing reinsertion was incorporated and expanded upon in the 1996 Amendments to the FCRA. Under Sect. 1681 (a)(5)(B), information cannot be reinserted unless it is "certified" as complete and accurate by the furnisher. Moreover, a CRA, five business days prior to any reinsertion, must notify the consumer, and also provide the name and address of the furnisher and inform him or her of his right to add a statement.

Despite these Consent Decrees, the problems of mixed files, inadequate reinvestigations and reappearance did not go away. Throughout the early 1990s, Congress held a series of hearings in which numerous consumers and consumer advocates described problems with inaccuracy, mixed files, CRA non-responsiveness, and inadequate reinvestigations. This resulted in the 1996 legislative amendments to the FCRA.

I cite this brief history because it makes clear that for many years, CRAs like TransUnion and Acxiom have been on notice from Congress, the FTC, State AGs, the media and the public that it is important to ensure accuracy, and to reasonably investigate consumer disputes, and that it can be highly damaging when inaccurate information is not removed.

10

### Identity Theft

It is essential that the trier of fact understand that another problem that poses a direct threat to the accuracy and integrity of personal data furnished by creditors and held by CRAs is identity theft. Identity theft occurs when an imposter steals a consumer's identity, usually through the use of the consumer's Social Security number, to exploit the innocent consumer's credit-worthiness. Identity theft is a sub-category of the more general category of Mixed Files, as the imposter-generated fraudulent activity is mixed into the consumer report of the innocent victim.

Trans Union statistics found that consumer inquiries about identity theft grew from 35,235 in 1992 to 522,922 in 1997. Subsequent GAO reports confirmed that identity theft continues to escalate in the United States. In 1999, Congress passed the Identity Theft Deterrence Act, specifically making it a federal crime to steal someone's identity.

By 2004, it was well known by CRAs, furnishers and the public that identity theft was a significant and growing problem that threatened the accuracy and integrity of credit report data. In addition to Congress devoting the entire year of 2003 amending the FCRA to strengthen consumer protections against identity theft, there was also a multitude of media coverage of the issue and even often-run television commercials highlighting it.

A 2003 FTC survey confirmed that identity theft was indeed a serious national problem, estimating in that year there were 9.9 million victims of identity theft, up from an estimated 6.9 million victims in 2002 and 3.4 million victims in 2001. Identity theft victims reported a wide range of problems, including wrongful bank and credit card charges, harassment by collectors, loan or insurance rejection, cut off of utilities, civil lawsuits, and criminal investigations.

The Identity Theft Resource Center (ITRC) published a survey of identify theft victims in 2003. The study concluded that the most severe damages might be the emotional distress that victims endure. Paul Colins, a credit industry analyst and consultant who worked with the ITRC, commented, "The range of emotions is wide and rather painful to read. Three-fourths of victims were left with a feeling of financial insecurity, 88% experienced anger, and 75% expressed a feeling of helplessness. While these feelings do appear to subside a little over time, the survey clearly shows for many victims the feelings linger on. While most surveys have focused on the financial costs to victims, these psychological impacts are generally unreported. They may, however, have far worse consequences for victims."

Dr. Charles Nelson, a licensed psychologist, and director of both the Crime and Trauma Recovery Program at the Family Treatment Institute, also reviewed the study:

"Identity theft has been classified in many realms as a victimless crime," Nelson wrote. "This survey was designed to test the emotional impact of identity theft and to discover if sufferers of this crime exhibit similar responses as those of more commonly recognized victims including rape, repeated abuse, and violent assault victims. Many of the listed symptoms are classic examples of Post Traumatic Stress Disorder and secondary PTSD (from secondary wounding)."

On March 7, 2000, Jodie Bernstein, then head of the FTC's Bureau of Consumer Protection, testified before Senate Judiciary Subcommittee on Technology, Terrorism and Government.  She gave similar testimony before Congress on July 12, 2000, emphasizing the difficulty that consumers had correcting records:

> The leading complaints by identity theft victims against the consumer reporting agencies are that they provide inadequate assistance over the phone, or that they will not reinvestigate or correct an inaccurate entry in the consumer's credit report. In one fairly typical case, a consumer reported that two years after initially notifying the consumer reporting agencies of the identity theft, following up with them numerous times by phone, and sending several copies of documents that they requested, the suspect's address and other inaccurate information continues to appear on her credit report. In another case, although the consumer has sent documents requested by the consumer reporting agency three separate times, the consumer reporting agency involved still claims that it has not received the information.

While credit report inaccuracy was the leading cause of complaints to the FTC in the early 1990s, for five years in a row (2001-2005), identity theft has been the leading cause of complaints to the FTC, far outpacing other categories.  For instance, here was the FTC's Top 10 Consumer Fraud Complaints list on January 23, 2002:

1)  *Identity Theft* (42%);
2)  Internet Auctions (10%)
3)  Internet Services and Computer Complaints (7%)
4)  Shop-at-Home and Catalog Offers (6%)
5)  Advance Fee Loans and Credit Protection (5%)
6)  Prizes/Sweepstakes/Gifts (4%)
7)  Business Opps. and Work at Home Plans (4%)
8)  Foreign Money Offers (4%)
9)  Magazines and Buyers Clubs (3%)
10) Telephone Pay-Per-Call/Info Services (2%)

As mentioned, the percentage of FTC complaints over identity theft have remained consistent to this day.

Improving consumers' ability to ensure the accuracy of their credit reports was a top priority of Congress in 2003, when it devoted the entire year to reviewing and strengthening the FCRA with enactment of the FACT Act (Fair And Accurate Credit Transactions Act).  Relevant to this case was the clear message from virtually all parties that identity theft posed a direct threat to the accuracy and integrity of data in credit reports, and that the inaccuracies to credit reports caused by identity theft were highly damaging to innocent victims.

12

Here's what Sen. Richard Shelby (R-AL), Chairman of the Senate Banking Committee, and principal sponsor of the FACT Act, said during his committee's hearing on identity theft:

> Soon thereafter, when the criminals' handiwork shows up on their credit reports, they face the considerable task of restoring their good name and credit. Plainly, this crime has many victims. Firms lose profits. *Individuals lose time, money, and peace of mind when their good name and reputation are tarnished.* [Emphasis added]
>
> In light of the serious nature of the consequences of identity theft, this issue would merit attention even if there were only a limited number of victims. Unfortunately, there are thousands of victims whose numbers are growing at an increasingly faster pace. Indeed, it has been asserted that identity theft is the fastest growing crime in America.
>
> This issue tracks across credit reporting in so many ways that it is essential that we consider it in the context of the reauthorization of the preemption provisions of the Fair Credit Reporting Act."[4]

Sen. Paul Sarbanes (D-MD), the Committee's ranking member, stated:

> Americans have strong concerns about protecting their confidential information. Honest citizens who are victims of identity theft incur a high cost in money, time, anxiety and effort to correct and restore their spoiled credit histories and good names."[5]

### Collection Is An Underlying Incentive For Furnishing

Many people do not realize that creditors' and collectors' furnishing of their customers' data to credit reporting agencies (CRAs) is entirely voluntary. A fundamental incentive for large creditors such as Defendants in this case is that credit reporting is a cost-effective means of enhancing debt collection.

Collectors and creditors are keenly aware that credit reporting is a "powerful tool designed, in part, to wrench compliance with payment terms." (Rivera v. Bank One, 145 F.R.D. 64, 623 (D.P.R. 1993)). Creditors' collection letters and debt-collecting operators often advise customer-debtors that if they don't pay their debt it will result in highly derogatory data being entered on that customer's credit report which may remain for up to seven years. Creditors' collection letters often advise customer-debtors that, "Any potential employer, mortgage company, car dealership or creditor is likely to see this remark. Such a condition is far more damaging than the delinquent status you now maintain."

When a consumer applies for a mortgage, or other major form of credit, the mortgage or credit often is not granted until all outstanding unpaid debts listed on the credit report are

---

[4] "The Growing Problem of Identity Theft and Its Relationship to the Fair Credit Reporting Act" June, 19 2003
http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Testimony&TestimonyID=108&HearingID=43
[5] *Id.*

resolved. Thus, a creditor that is owed money, or that still hopes to collect money whether or not it is actually owed by the consumer, enhances its ability to garner payment by reporting the debt to that consumer's credit report. This practice his highly problematic and damaging to the consumer when the consumer in fact does not actually owe the amount being reported to his credit report. However, it is conceivable that such practices would cause consumers, particularly those who did not know their rights, to consider paying off debts that they did owe in order to remove serious derogatory data from their credit reports.

As I wrote in my book, "Credit Scores and Credit Reports,"

> … Creditors view credit reporting as an arm of debt collection – a sort of last resort that will catch up with non-paying consumers sooner or later. This practice "crosses the line" when creditors and collectors threaten to report debts – or actually report debts – that they know or should know are not the responsibility of the consumer. [Page 31 – Third Edition]

TU played a significant role in helping collectors cross that line in the case of the Plaintiff, in my opinion.

### Damaging Nature of Inaccuracies

The inaccuracies on plaintiff's credit reports were damaging in several ways. First, the various negative notations on the Plaintiff's credit reports qualified as major derogatories, which at certain points, ensured significant damage to plaintiff's credit score.

Second, Plaintiff's credit reports portrayed her as someone with unpaid collections or outstanding obligations that were still owed. The typical consequence of this is that at a creditor will not extend credit to applicants until they "resolve" the outstanding debt. A consumer can "resolve" it by disputing it and removing it from his credit report. However, given the difficulty that this can entail, it is often easier and faster to resolve it by paying it. But Plaintiff justly refused to do this.

The various inaccuracies, which persisted because of the Defendants' inadequate investigations, were the predominant reasons for the damage to the Plaintiff's creditworthiness, and consequently, for the interference and loss of time involved when she sought to obtain credit, and which she would have obtained without such interference or loss of time were it not for the Defendants' failures.

### 'Non-Economic' Damages

The above cited "economic" damages are easier to identify and quantify, and therefore easier for some people to understand.

In my experience, however, in the cases of victims of chronic credit report inaccuracy, the damage on one's well being and lifestyle are often much more profound. For starters, the vast majority of Americans are very concerned about maintaining their good names, a fact that is

reflected in FTC complaint statistics. People like Plaintiff who have worked hard for years to maintain her good name in the credit world describe it as extremely hurtful to be portrayed by supposedly reputable, nationwide organizations as irresponsible deadbeats. But that is only the beginning of the harm.

To fully understand the nature of the damage, it is necessary to recognize the interrelationship between the "economic" and "non-economic" damage. The initial inaccuracy set off a chain reaction that ultimately casts a dark shadow over the victim's life. As her good name is besmirched, a victim of chronic inaccuracy once taken for granted are vanishing. Plaintiff was a case in point. As the erroneous collection and other derogatories caused damage to her creditworthiness, she was unable to obtain or enjoy credit in the manner to which she was entitled.

Moreover, this was particularly damaging for Plaintiff because she understood that the derogatory tradelines on her credit reports could negatively impact her career.

This assuredly impacted how Plaintiff felt about herself in particular and about life in general, as well as their interpersonal relationships. Like other victims of chronic inaccuracy, Plaintiff's plight symbolizes the nature of, and interrelationship between, "economic" and "non-economic" damage.

Now consider the impact that such an environment would have on a reasonable person's psyche, inter-personal relationships, ability to concentrate, organize and perform at work, and ability to enjoy life. Clearly, any reasonable person would be negatively impacted.

Greatly compounding the harm is the frustration, stress, and trepidation that victims such Plaintiff endure as they are unsuccessful in their reasonable attempts to restore accuracy to her credit life. The truth was that Plaintiff not responsible for the derogatory accounts generated by OMC on her credit reports. However, supposedly reputable institution like the Defendants were effectively telling the financial services industry and employers through the consumer reporting systems that Plaintiff was an irresponsible deadbeat. Plaintiff truthfully told TU that she was not responsible and was being unfairly and inaccurately associated with collections and other derogatory data. Yet TU effectively disregarded her disputes.

### Potential Areas of Testimony: Damages Known & Common To Victims of Chronic Credit Report Inaccuracy/Identity Theft

It is important that the trier of fact understands that victims of chronic credit report inaccuracy or identity theft often experience a series of several known and common types of negative impacts.

### Some Categories of Typical Negative Impacts of ID Theft & Chronic Inaccuracy

(1) Inaccurately described as not creditworthy and/or less creditworthy to third parties
(2) Improperly denied credit because of inaccurate data, or only able to obtain credit at less favorable rates

(3) Expended time and energy to correct errors not of one's making; in addition to loss of time and energy, loss of opportunity
(4) Wrongfully received debt collection calls
(5) Chilled from applying for credit
(6) Sleeplessness, physical symptoms
(7) Sense of helplessness, loss of control over personal data
(8) The emotional distress stemming from, and associated, with all of the above

The following factors could be used to gauge the severity of damage within each category.

### Key Factors To Consider When Assessing Severity of Negative Impact

The nature and substance of the category of damage
Time & energy to solve the immediate problem
The expectation that the problem was solved
The number of recurrences
The period of time over which the problem persist

### Plaintiff's Damages Were Consistent with Other Victims of Credit Report Inaccuracy

Plaintiff's damages were consistent with other victims of chronic credit report inaccuracy. Her experience touched on most if not all of the eight categories cited above. In addition to the categories above, it is important for the trier of fact to understand that it can be very stressful not knowing everyone who may have associated you with highly derogatory credit data. Moreover, in my opinion, it can be difficult to maintain constructive personal relationships under stress.[7] It can be difficult to perform adequately at one's job.

### Defendant Knew or Should Have Known It Actions Would Have Negative Impact

The history of credit reporting cited below, which includes years of Congressional testimony and legislative actions, Federal and State enforcement actions, abundant media coverage and targeted books, such as mine, should have made it abundantly clear to Defendants that failing to prevent Plaintiff from becoming a victim of chronic inaccuracy would have a highly negative impact on her.

---

[7] In fact, the insurance industry says that stress, stemming from financial problems, can cause auto accidents, and therefore justifying its use of credit reports in setting insurance rates.

## Part 2

### Potential Areas of Testimony: General Issues, Context

**Table of Contents**

A.    **The Nature and Purpose of Credit Scores**
B.    **The Nature and Purpose of Credit Reports**

### Nature & Purpose of Credit Scores

It is possible that the trier of fact is not intimately familiar with either the credit reporting or credit scoring systems. If this is the case, I can provide expert testimony on the nature of both systems, how to read and understand credit reports and how to dispute errors, the parameters of credit scoring, the general impact that derogatory data have on a credit score, the interplay between identify theft, credit scoring and credit reporting, and other related matters.

A credit score is a number that reflects a consumer's creditworthiness at a given point in time. The FICO model credit score, which is used by 75 percent of lenders, is based entirely on information in a consumer's credit report. The model was developed by Fair, Isaac & Co., which licenses it to Equifax, Experian and Trans Union and others. The scoring range for the FICO "classic" model is 300-850. The various types of "Beacon" scores sold by Equifax, and "Classic FICOs" sold by Trans Union,[8] are based upon the FICO model. The higher the credit score, the less risky the consumer is viewed by creditors. Consequently, consumers with higher-end credit scores (720 and above) often can obtain the most favorable rates for mortgages, refinancing, personal and auto loans and auto and homeowners insurance, and also often receive solicitations for the best quality credit cards. Conversely, the lower the score, the less favorable the rate. A credit score of 620 and below is widely regarded as "sub-prime."

Maintaining a good credit score is important because of a fundamental rule: the lower one's score, the more one pays for credit, including higher interest on mortgages, auto loans, installment loans and credit cards.

For example, the Web site of Fair Isaac Corp., www.myfico.com,[9] gives this example of the difference that credit scores make in terms of interest and monthly payments, on a $300,000 30-year, fixed-rate mortgage:

| Your FICO® Score | Your Interest Rate | Your Monthly Payment |
|---|---|---|
| 760 - 850 | 6.148% | $1,827 |
| 700 - 759 | 6.370% | $1,871 |
| 680 - 699 | 6.654% | $1,927 |
| 660 - 679 | 7.464% | $2,090 |
| 640 - 659 | 8.816% | $2,374 |

---

[6] In previous years, the Trans Union FICO Score was called "Empirica"
[7] Visited September 21, 2005

620 - 639                  9.782%                  $2,584

A similar chart exists for auto loans.  Moreover, about half of the major credit card companies practice "Universal Default," meaning that these companies will raise their cardholders' interest rates if those cardholders' credit scores drop below certain levels – even if the cardholder never had a late payment with the company.[10]

1.     The precise workings of the FICO score are highly proprietary and therefore closely guarded.  However, the general parameters are publicly available:[11]

 **35% -- Payment history.**  Late payments, particularly major or serious derogatories, like 90-days late or worse, and particularly on important accounts like mortgages, are very damaging to one's credit score.

 **30% -- Credit Utilization.** The ratio between available "revolving" credit and how much is actually used (credit card balances vs. credit card limits).

 **15% -- Length of Credit History.**  The longer you maintain a positive credit history, the better it is for your credit score.

 **10% -- How Much New Credit?.**  This relates to "inquiries" that creditors make when you apply for credit.

**5% -- Healthy Mix of Credit?**  The scoring model prefers to see a "healthy mix" of mortgage, credit cards and perhaps other kinds of credit.

2.     It is important to understand that consumers are most severely penalized when they have a serious derogatory within the past eleven months.  The "importance of being recent" is illustrated by the following Fair Isaac chart, which shows, in a proportional sense, that a major delinquency in the past year has the greatest negative impact, and that the negative impact decreases significantly with each year.

---

[8] Universal default is described in detail in Chapter 22 of the 2nd Edition of "Credit Scores and Credit Reports," op. cit.

[11] These parameters are published in Chpr 1 of both Editions of "Credit Scores and Credit Reports," op. cit.

**Previous credit performance** 



There is growing public awareness about credit scoring, but it is by no means complete. A September 2004 survey by Opinion Research Corporation Intl. sponsored by the Consumer Federation of America (CFA) and Providian Financial, a major credit card issuer, found that:

> Few consumers know what constitutes a good score. Only 12% correctly identified the low 600s as the level below which they would be denied credit or have to pay a higher, sub-prime rate. (One-third thought this level was the low 500s, and 30% said they didn't know.) And, only 13% correctly understand that scores above the low 700s usually qualify them for the lowest rates. http://www.consumerfed.org/092104creditscores.PDF

A March 2005 General Accounting Office study found that about one-third of respondents had obtained their credit scores. While 70 percent of respondents correctly identified the definition of a credit score and understood many of the factors that could impact credit scores, only 28 percent could provide a number within a range of possible credit scores. In addition, consumers were more familiar with some of the factors that affected credit scores than with others. For example, while most consumers knew that skipping loan payments or making late credit card payments had a negative effect on credit scores, about half did not know that using all the credit available to them, such as reaching the maximum limit on a credit card or home equity loan, had a negative effect. Also, when asked about information that had no effect on credit scores (such as a low checking account balance), about half of consumers answered the questions incorrectly or said that they did not know, the GAO found.[12]

---

[12] General Accounting Office, "Credit Reporting Literacy: Consumers Understood the Basics but Could Benefit from Targeted Educational Efforts" (GAO-05-223). www.gao.gov/new.items/d05223.pdf

## Nature & Purpose Of Credit Reports

Similar to credit scoring, there is growing public awareness about the credit reporting system, but it is not universal.

According to a July 2003 survey by the Consumer Federation of America, "Only 25 percent of Americans – and less than 20 percent of those with incomes below $35,000 – said they knew what their credit score was. But only three percent of Americans could, unprompted, name the three main credit bureaus-Experian, Equifax, and Trans Union-that provide both lenders and consumers with information from credit reports. Forty-three percent of Americans (35 percent of those with incomes below $35,000) said they had obtained a copy of their credit report from the three credit bureaus in the past two years."

A March 2005 General Accounting office report concluded that the public's understanding of credit reports and credit scores was improving, but that a federal education campaign was needed to better inform those segments of the population that remain unfamiliar with the systems. The report found that 60 percent of respondents had seen their credit reports, most often because they were making a large purchase or refinancing a loan. Most of these consumers said that they understood their reports. However, about half (53 percent) did not know that information could stay on their report for 7 or 10 years.[13]

It is important that the trier of fact have an accurate understanding of the nature and purpose of credit reports. Accordingly, a brief description of the consumer report is fundamental to my opinions in this case.

A consumer report, sometimes referred to as a credit report, consists of highly sensitive and personal information, containing a compilation of a consumer's current credit relationships, their credit history, their employment history, estimated income and identifying information, such as name, address, phone number and Social Security Number (SSN). There are three major repositories known as credit bureaus or consumer reporting agencies (CRAs) -- Equifax, Trans Union and Experian. The CRAs regularly receive updates on a consumer's credit relationships from credit grantors -- banks, mortgage companies, credit card issuers, department stores and others. The consumer report typically contains highly sensitive details about a consumer's finances, including account numbers, loan amounts, credit limits and payment history. It also can contain information on the consumer's interaction with the judicial system, including paid or unpaid civil judgments or bankruptcies.

The Credit Report consists of three (or four) basic sections:

(1)     A section with the consumer's *identifying information*-name, address, Social Security number, date of birth, previous address, employer, and sometimes phone number.

---

[13] *Ibid.*

(2)     A section with the consumer's *payment history*, including mortgage, auto and installment loans, credit cards and department store cards, collections, and public records like bankruptcy and court judgments.

(3)     If applicable, a section showing *public record* information, like bankruptcies, court judgments and tax liens.

(4)     A section showing *inquiries*, in other words, those companies which accessed the report and for what purposes.

In addition, attached to the credit report is

(1) A form for disputing errors, and
(2) A statement of your rights under the FCRA

Each of the Big Three CRAs uses a slightly different format. A fundamental purpose of the credit report is to describe a consumer's creditworthiness. For example, the Equifax report lists the codes showing how consumers are classified when they don't pay their bills on time. Along with these numeric codes, a credit report can have a letter showing the type of credit, i.e., "R" for revolving (credit card) and "I" for installment (personal loan). The code for someone who always paid her credit card on time would be "R1." Here are the numeric codes:

- 2 : 30-59 Days Past Due
- 3 : 60-89 Days Past Due
- 4 : 90-119 Days Past Due
- 5 : Over 120 Days Past Due
- 7 : Included in Wage Earner Plan
- 8 : Repossession
- 9 : Charge Off
- Blank : No Data available for that month
- 0 : Too new to rate, or unrated
- 1 :  On Time

The Trans Union and Experian credit reports describe similar categories with a text narrative, rather than with an alpha-numeric code.

It is important to note that public record information like bankruptcy, judgments and tax liens, and charge-offs (R-9) and collections, are considered some of the most negative entries. It is also important to note that when a creditor reports a negative tradeline as disputed, that tradeline typically is not scored and therefore does not negatively impact the credit score.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit, whether it is a loan or a credit card. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers use

credit reports for underwriting purposes, and also use credit scores, but presumably only where not prohibited by State law.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit.  Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness.  This is known as an "Account Review."  Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers.  Some employers use consumer reports to evaluate job applicants.  Insurers also can use credit reports for underwriting purposes.  Landlords also use credit reports for tenant screening.

### Background & Qualifications (Curriculum Vitae Attached)

My expertise in credit reporting stems from several of my professional activities, including:

(1) Editor/Publisher of a specialty news reporting service that covers credit reporting, Fair Information practices and related matters;

(2) Author of the book <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do,</u> 3rd Edition, (Privacy Times 2005), and co-author of a book with a chapter on credit reporting;

(3) An expert witness qualified by Federal and State courts in Fair Credit Reporting Act (FCRA) litigation;

(4) an expert on credit reporting who has testified before Congress on numerous occasions, including four hearings in 2003, and who has testified twice before the California legislature in regards to legislation on the use of financial data, and who regularly presents at Continuing Legal Education and other professional events; and

(5) an expert consultant to government agencies and private corporations, a member of the Consumer Advisory Council of Experian (one of the three national Credit Reporting Agencies (CRAs), and as one who has earned FCRA Certification from the National Credit Reporting Association (NCRA).

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA).  The newsletter ranges from 8-12 pages, 23 issues per year.  Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

I am author of the book, <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u> (3rd Edition, Privacy Times 2007.  The book has 23 Chapters, 399 pages and 415 footnotes. As the title indicates, it describes how the credit scoring and credit reporting systems work and what consumers can do to obtain their reports, read and understand them, correct errors in them and enforce their rights.  I also am co-author of <u>Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society</u> (2nd Edition, Southern Illinois University Press, 1990), which has a chapter on credit reporting.

Since the early 1990s, I have served as an expert witness in numerous FCRA cases and have been qualified by the federal courts.  As an expert witness, I have had the opportunity to read thousands of pages of deposition testimony by consumer reporting agency officials and by credit grantor personnel responsible for reporting data to CRAs. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and

practices for handling personal data.  In fact, CRAs typically consider such procedures and practices to be proprietary and/or trade secrets.  To my knowledge, the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.  Due to my access to this information, I have augmented my specialized body of knowledge on practices and procedures related to credit scoring and credit reporting.

I have testified numerous times before Congress – always by invitation – on issues related to the collection, maintenance, security, use and disclosure of sensitive personal data, including credit reports and other financial information.  (Consult CV for list of hearings and Web links to testimony.)

In 2003, the year in which Congress was dedicated to a major upgrade of the FCRA, I testified twice before the Senate and twice before the House, and presented once before the FTC. The hearings covered a wide range of credit reporting issues, accuracy, fairness, privacy, CRA procedures and security:

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[14]

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[15]

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[16]

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[17]

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

Some of my recommendations were reflected in the final FCRA Amendments approved by Congress and signed by President Bush in December 2003.

On December 3, 2002, I testified before the California State Senate Insurance Committee. On January 29, 2003, I testified before the California State Assembly Insurance Committee. Both Committees were considering financial privacy legislation (SB 1), which ultimately was enacted by the legislature and signed into law in September 2003.

---

[14] http://banking.senate.gov/03_07hrg/071003/index.htm
[15] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[16] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[17] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

24

I regularly present at Continuing Legal Education or professional seminars related to the FCRA. (Consult CV.)

Two of the three major CRAs have acknowledged that I am an expert on credit reporting as it relates to "Fair Information Practices."  First developed in the United States in the late 1960s, Fair Information Practices (FIPs) standards are at the core of the FCRA and most other U.S. and European privacy and data protection laws, and serve as an internationally accepted standard for gauging privacy policy and practices.

In 1990, Equifax published "The Equifax Report on Consumers In the Information Age," a nationwide opinion survey and analysis by Louis Harris and Associates and Prof. Alan F. Westin.  The report listed me as a privacy expert to whom the authors expressed appreciation for my advice on survey coverage.

In April 2002, I accepted Experian's invitation to serve on the Experian Consumer Advisory Council of Experian (formerly TRW), a national CRA and vendor of other information services.  Before being disbanded in 2004, the Council met twice a year to offer non-binding advice and to discuss a host of credit reporting, marketing and other privacy-related topics.

In 2004, I passed an industry examination, thereby earning "FCRA Certification" from the National Credit Reporting Association.

Since August 1998, I have served under contract as a member of the Social Security Administration's Panel Of Privacy Experts advising the agency on a host of issues.

(Please consult the attached CV for additional information.)

# *Evan D. Hendricks*

## *CURRICULUM VITAE*

### Professional Activities

1981- Present      **Editor/Publisher** of *Privacy Times*

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

### 1992 – Present      Expert Witness

Qualified by the federal courts in FCRA and identity theft cases. (Complete list attached). I have read extensive deposition testimony by credit bureau and credit grantor personnel. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data, and the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.

### 1998 – 2008      Privacy Expert Consultant, U.S. Social Security Administration

Regularly review policies and practices in relation to the collection, use and disclosure of personal data and Social Security numbers and provide feedback and recommendations.

### 2002 – 2004      Member, Experian Consumer Advisory Council

Along with other Council members, I provide an outsider's view on credit reporting, marketing and other privacy issues.

### July – October 2002      Consultant to U.S. Postal Service

Working with the USPS's Chief Privacy Officer, I assisted in reviewing and editing the re-write of the USPS's Privacy Act notices, with an emphasis on "Plain English."

---

**Evan Hendricks        P.O. Box 302        Cabin John, MD 20818**
**(301) 229 7002  (301) 229 8011 [fax]  evan@privacytimes.com**

---

**Recent Testimony Before Congress & The FTC**

"What Borrowers Need to Know About Credit Scoring Models and Credit Scores," House Financial Services Subcommittee on Oversight, July 29, 2008.[18]

"Credit Reports: Consumers' Ability to Dispute and Change Information," House Financial Services Committee, June 19, 2007.[19]

"Privacy in the Commercial World II," House Energy & Commerce Subcommittee On Commerce, Trade, and Consumer Protection, June 20, 2006[20]

"Financial Data Protection Act of 2005," House Financial Services Subcommittee on Financial Institutions and Consumer Credit, November 9, 2005[21]

"Credit Card Data Processing: How Secure Is It?" House Financial Services Subcommittee on Oversight and Investigations, July 21, 2005[22]

"Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information,"[23] Senate Banking Committee, March 15, 2005

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[24]

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[25]

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[26]

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[27]

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

---

[18] http://www.house.gov/apps/list/hearing/financialsvcs_dem/hr072908.shtml
[19] www.house.gov/apps/list/hearing/financialsvcs_dem/ht061907.shtml
[20] http://energycommerce.house.gov/108/Hearings/06202006hearing1938/Hendricks.pdf
[21] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=425
[22] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=407
[23] http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Detail&HearingID=144
[24] http://banking.senate.gov/03_07hrg/071003/index.htm
[25] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[26] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[27] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

**Books**

Credit Scores and Credit Reports: How The System Really Works, What You Can Do
[3rd Edition] (Privacy Times, 2007)

Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition,
Southern Illinois University Press, 1990), (Includes a chapter on credit reporting)

Former Secrets: Government Records Made Public Through The Freedom of Information Act
(Campaign For Political Rights, 1982)

**International Lectures**
24th International Conference of Data Protection & Privacy Commissioners (Cardiff, Wales –
Presentation published in conference proceedings, 2002)

The 23rd International Conference of Data Protection Commissioners (Paris, La Sorbonne –
Presentation published in conference proceedings, 2001)

The 22nd Annual Conference on Data Protection (Venice, Italy -- 2000)

The 16th Annual Conference on Data Protection (The Hague, The Netherlands -- 1994).
In the 1980s, served as an expert consultant to both the Privacy Commissioner of Canada and
Privacy Commissioner of Australia.

**Presentations/Instruction At Recent CLE & Professional Seminars**

"Second Law and Information Society Symposium: Enforcement, Compliance and Remedies in
the Information Society," Presenter, "Credit Report Cases – Effective Remedies?"  Center on
Law and Information Policy (CLIP), Fordham Law School, New York, May 29-30, 2008.[28]

"The 1st Annual Privacy Law Scholars Conference," Presenter, "Assessing Privacy Harm: How
can victims of privacy violations prove that they have been harmed?  The George Washington
University Law School, Washington, DC, June 12-13, 2008.[29]

"11th Annual Consumer Financial Services Litigation," Practicing Law Institute, March 20-21,
2006 (New York City)

"Bankruptcy Roundtable," and, "Fair Credit Reporting Act Roundtable," National Consumer
Law Center, October 27, 2005

"Advanced Consumer Litigation," Texas Bar CLE, Feb. 10-11, 2005

"Financial Privacy Litigation," (Impact of FACT Act), Practicing Law Institute,
February 28- March 1, 2005 (New York City)

---

[28] http://law.fordham.edu/ihtml/eventitemPP.ihtml?id=37&idc=8943&template=clip
[29] http://privacyscholars.com

"The New FACT Act: Challenge & Oppty.," Privacy & American Business, Feb. 9-10, 2004

"Understanding the FACT Act And The Impact of Multi-Agency Rulewriting Process," Glasser LegalWorks, Sept. 28-29. 2004

"12th Annual National Conference," National Credit Reporting Association, Nov. 10-12, 2004

**Professional Societies**

Past President & Board Member, American Society of Access Professionals www.accesspro.org

**Industry Certification**

FCRA Certification, National Credit Reporting Association (www.ncrainc.org).

**Media**

In addition to being a paid consultant and special guest on CNN's IMPACT news in 1996, I am quoted regularly by major and small newspapers (including The Washington Post, New York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Newsweek and Money Magazine), regarding issues of privacy generally and the privacy implications of consumer reporting specifically. I have appeared on National Public Radio, PBS NewsHour with Jim Lehrer, ABC Nightline and World News Tonight, NBC Nightly News, CBS Evening News, CNN News Watch, CNBC, MSNBC, Fox News, various local affiliates, and the Oprah Winfrey Show and Geraldo, regarding these issues as well.

**Education**

Bachelor of Arts, Columbia College, Columbia University, New York, N.Y. (1979)

**Testimony & Expert Reports**

Within recent years, I have testified at trial, or been deposed as an expert, in the following cases:

Andrews v. Trans Union Corp. et al., Case No. 96-7369, (USDC-C.D. Calif.), concerning theft-of-identity and consumer report inaccuracies. Expert report, deposition, trial testimony. Judge Lourdes Baird presiding. The U.S. Court of Appeals for the Ninth Circuit specifically found that my opinion on the prevalence of identity theft was relevant to the reasonableness of CRA procedures. (see 225 F.3d 1063 (2000)).

Harold & Beryllin Gamby v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Michigan [Southern Div.] (CV-06-11020-MO). FCRA, identity theft. Expert report. Deposition. Trial Testimony. Judge Marianne O. Battani presiding.

Angela P. Williams vs. Equifax Information Services, LLC, et al., Circuit Court for the Ninth Judicial Circuit, Orange County Florida. Credit Reporting. Expert disclosure and report. Deposition. Trial Testimony. Judge George A. Sprinkel IV presiding.

Rebecca L. Valentine. v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. CV 05-801-JO. FCRA, identity theft. Expert report. Deposition. Trial Testimony. Judge Robert E. Jones presiding.

Nicole Robinson vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272. Expert reports. Deposition. Trial Testimony  Judge Walter H. Rice presiding.

Suzanne Sloane vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272. Expert reports. Deposition. Trial Testimony  Judge Leonie M. Brinkema presiding.

Sandra Cortez vs. Trans Union, LLC., U.S. District Court for the Eastern District of Pennsylvania: No. 2:05 –cv—05684-JF. FCRA. Expert Report. Daubert Hearing. Trial Testimony. Senior Judge John P. Fullam qualified me to testify at trial.

Patricia Holmes vs. TeleCheck Intl., Inc., U.S. District Court for the Middle District of Tennessee (Nashville Div.). FCRA. Expert report. Deposition. Trial Testimony. Chief District Judge Todd J. Campbell presiding.

Federal Trade Commission vs. Accusearch, Inc., et al., U.S. District Court for the District of Wyoming, Case No. 06CV0105-D. FTC Section 5. Expert Report. U.S. Magistrate Judge William C. Beaman rejected Defendant's motion to exclude my testimony.

Eddie Silva, et al. v. Haynes Furniture Co., Inc.: U.S. District Court for the Eastern District of Virginia: No. 4:04CV82. FCRA. Fairness hearing testimony. Judge Walter D. Kelley, Jr. presiding.

Joi Helmes v. Wachovia Bank N.A.: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 01-81277-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony. Judge Robert G. Mayer presiding.

Alex Campos and Michael York v. ChoicePoint Services, Inc.: U.S. District Court for the District of Georgia (Atlanta), Civ. Action No. 1-03-CV-3577-WSD. FCRA. Expert Declaration. Fairness hearing testimony. Judge William S. Duffey, Jr. presiding.

Denis W. Stasulis v. Suntrust: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 04-12542-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony. Judge Robert G. Mayer presiding.

Dwaine Perry, et al. v. FleetBoston Financial Corp.: U.S. District Court for the Eastern District of Pennsylvania: No. 04-507. FCRA. Expert Report. Fairness hearing testimony. Judge Berle M. Schiller presiding.

Tammy Cochran v. C&M Motors, LLC, dba I-10 Toyota, et al: U.S. District Court for the Central District of California, No. CV-03-3568FMC. FCRA. Expert Report. Trial Testimony Judge Florence-Marie Cooper presiding.

Myra Coleman v. Trans Union LLC, CA4: 98-CV-169B-B (USDC-Mississippi) FCRA. Expert report, deposition, trial testimony. Judge Neal B. Biggers presiding.

Arthur Spengler v. Sears Roebuck & Co., Case No. C-03-0557. (Circuit Court, Wicomico County, Maryland). Tort, Interference with Business Relationships. Trial Testimony. Judge D. Davis qualified me as expert on credit scoring, credit reporting and FCRA-related issues.

Judy C. Thomas v. Trans Union LLC, U.S. District Court for the District of Oregon; Case No. 00-1150-JE. FCRA. Expert report, deposition, trial testimony. Magistrate Judge John Jelderks presiding.

Scott E. Campbell v. G.E. Capital Auto Lease, Circuit Court For St. Mary's County, Maryland, Case No. 99-522. FCRA, invasion of privacy. Expert report, deposition. Judge Karen Abrams qualified me to testify, but the case settled one week before trial.

Franklin F. Grizzard, Jr. v. Trans Union, L.L.C., & Equifax Information Services L.L.C., et al.: U.S. District Court for the District of Virginia (Richmond Div.); Nos. 04-CV-625 & 04-CV-626, respectively. Expert report. Affidavit. Deposition. On the eve of trial, Judge Richard Williams rejected Defendant's motion to disqualify me. The case settled shortly thereafter.

Catherine Smith, et al. v. Progressive Corporation, et al.: U.S. District Court for the Middle District of Florida (Gainesville), Case No.1:00-CV-210-MMP. Expert Report, Declaration of Value, Fairness Hearing testimony. Judge Maurice M. Paul presiding.

Franklin E. Clark, et al. v. Experian, et al.: U.S. District Court for the District of South Carolina, Case Nos. 8:00-1217-22, 8:00-1218-22, 8:00-1219-22. Affidavit, Supplemental Affidavit (both affidavits were admitted into evidence without objection). Judge Cameron McGowan Currie presiding.

Marie Ann Fuges v. Southwest Financial Services, LTD: U.S. District Court for the Eastern District of Pennsylvania (No 09-699). Expert report. Deposition.

Alisha Wilkes v. Experian Information Solutions, et al.: U.S. District Court for the Eastern District of Virginia (CV- 1:10-cv-01160-CMH -TRJ). Expert report. Deposition.

Serena Beachley v. PNC Bank N.A..: U.S. District Court for the District of Maryland [Northern Div., Case No. CCB-10-1774. Expert report. Deposition.

In re: Pammalla Shannon Uplinger v. Rees Broome, P.C.,: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria Div.); Case No. 90-13129-RGM. Expert report. Deposition.

Jose Soto v. Capital One Auto Finance, et al.: U.S. District Court for the District of Western Washington (2:08-cv-01838-RSM). Expert report, deposition.

Terri N. White, Jose Hernandez, et al. v. Experian Information Solutions, et al.: USDC-Central Dist. Of California; Case No. 05-cv-1070- DOC (MLGx). Declarations, Deposition.

Tara Andrews v. Equifax Information Solutions, Inc., et al.: U.S. District Court for the Western District of Washington; (No. 2:09–CV–00817-JJC). Expert report. Deposition.

Michelle Jansen v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. 05-CV 0385-BR. Expert report. Deposition.

James Byrd v. TransUnion LLC, Experian Information Solutions, Inc., Equifax Credit Information Services, LLC: U.S. District Court for the District of South Carolina [Columbia Div.]. Expert report. Deposition.

David L. Jackson v. Trans Union, et al.: U.S. District Court for the District of Oregon. FCRA. No. CV-08-0060-MO. Expert report. Deposition.

Richard Chakejian  v. Equifax Information Services, LLC. : U.S. District Court for the Eastern District of Pennsylvania; No. 07-2211. Bruce A. Summerfield  v. Equifax Information Services, LLC. : U.S. District Court for the District of New Jersey; No. 08-1450.  FCRA. Expert reports.  Consolidate deposition.

Marlos Uzzell v. Experian Information Systems, Trans Union, et al.: U.S. District Court for the Eastern District of Pennsylvania (No. 2:08-CV-02538-CMR). Expert report. Deposition.

Baxter Robinson v. Chase Mortgage Services, Inc., et al.: U.S. District Court for the District of South Carolina (Charleston Div.) (2:08-cv-02087-PMD). Expert report, deposition.

Risa Joyce Deutsch v. Arrow Financial Services LLC, et al: U.S. District Court for Middle the District of Florida [Tampa]; No. 8:08-cv-01469. Damage to credit. Expert report, deposition.

Michael D. Scott, et al. v. Graphic Center, CalPERS, et al.: Superior Court of the State of California, County of Los Angeles. Case No. BC390593397636. Data breach. Declaration.

Christopher K. Jung v. Trans Union, et al.: U.S. District Court for the Eastern District of Pennsylvania (No. 07-2514). Expert report, deposition.

Robert Saindon v. Equifax Information Services, et al.: U.S. District Court for the Northern District of California (08-cv-01744 WHA). Expert report, declaration. deposition.

Christina Lee v. TransUnion, et al.: U.S. District Court for the District of Oregon (CV-07-0998-MO). Expert report, deposition.

Emelia Pasternak v. TransUnion, et al.: U.S. District Court for the Northern District of California. Case No. 4:07-cv-04980-CW Expert report, deposition.

Stacy Fiano v. Experian Information Solutions, et al., U.S. District Circuit Court of the Southern District of Florida 9:08-cv-80555. Expert report, deposition.

Alana Valerie Sheldon v. Trans Union, LLC., LVNV Funding, LLC. & Resurgent Capital Services L.P.: U.S. District Court for the District of Maryland; 8:08-cv-00057-PJM. Expert report, deposition.

In Re: Cellphone Termination Fee Cases, Superior Court of the State of California, Alameda County, JCCP No. 4332. Deposition.

Karl Benedikt v. ChoicePoint, Inc.,: U.S. District Court for the District of New Jersey [Newark Vicinage]; 07-2569. Expert report, deposition.

Maria D. v. Comcast Corp., Sacramento Superior Court, Case No. 03AS05745. Deposition.

Abdirizak Gayre v. CSC Credit Services, Inc., Equifax Information Services, LLC, and Afni, Inc.: U.S. District Court for the District of Minnesota (C.A. No. 07-CV-0622 [JRT/FLN]). FCRA. Expert report, deposition.

Eric Robert Drew  vs. Equifax Information Services, LLC, et al., U.S. District Court for the Northern District of California , Case No.  CV 07-00726-SI. Expert report, deposition.

33

Erin Ayles v. Experian Information Solutions, Inc.: U.S. District Court for the Eastern District of Virginia (Alexandria Division); 1:07cv 662.  Expert report, deposition.

In Re: Farmers Insurance Co., Inc., FCRA Litigation, U.S. District Court for the Western District of Oklahoma, Case No. CIV 03-158-F.  FCRA.  Expert report, deposition.

Steven E. Beck v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Virginia: No. 1-05cv347.  FCRA.  Expert report, deposition.

Mary Ann Whiteker, et al. v. Chase Bank, et al..

Ford Motor Credit Co. v. Sudesh Agrawal, Court of Common Pleas, Cuyahoga Country, Ohio; Case No. CV04536588.  Credit reporting and credit scoring. Deposition.

Larry Alabran v. Capital One Services, Inc.: U.S. District Court for the Eastern District of Virginia (Richmond Division); Case No. 3:04-CV-935. Expert report, deposition.

Gail Cope v. MBNA American Bank NA: U.S. District Court for the District of Oregon; No. 04-CV-493-JE.  Expert report, deposition.

Robert Gordon Peoples v. Experian Services Corp., et al.: U.S. District Court for the Central District of California: No. CV-04-1378 CAS (Ex). Expert report. Deposition.

Lottie Robertson v. Experian Information Services, Inc. & Capital One Bank: U.S. District Court for the Eastern District of Michigan (Southern Div.) No. 04-72308. Expert report. Deposition.

Barbara A. Harris v. Experian Information Solutions, Inc., and Equifax Credit Information Services, Inc: U.S. District Court for the District of Oregon, Civil No. 01-1728-JE. FCRA. Expert reports. Deposition

Bruce Danielson v. Experian Information Solutions:  U.S. District Court for the Northern District of Texas, Case No: 3-04CV-1722N. FCRA. Expert report. Deposition.

Stacy Lawton Guin, et al. v. Brazos Higher Education Service Corporation, Inc.: USDC-Minnesota – No. CV 05-668 RHK/JSM. Negligence. Security Breach. Affidavit. Deposition.

Anthony Chin v. State Dept. Federal Credit Union: Circ. Ct. Prince George's County (Maryland); Civ. Act. No. CAL04-12778; Tort. Deposition.  Trial testimony.

James M. McKeown v. Sears Roebuck & Co., et al: U.S. District Court for the Western District of Wisconsin, Civil No. Case No. 03-CV-0528 C.  Expert Report, deposition.

Paulette Field v. Trans Union LLC, et al., Case No. 01 C 6390 (USDC-N.D. Illinois - Eastern Div. FCRA. Expert report.  Deposition.

Earle E. Ausherman, et al. v. Bank of America Corporation et al.: U.S. District Court for the District of Maryland, Civil Action No. MJG-01-438. FCRA. Expert report. Deposition

Jesse Klco v. Elmhurst Dodge, U.S. District Court for the Northern District of Illinois (Eastern Division) Civil Action No. 01 C 0433. FCRA. Expert report, deposition.

(David & Ruthie Keefner v. Webb Ford, Inc. & Deon L. Willis.: U.S. District Court for the Northern District of Illinois (Eastern Division), Civil Action No. 02C-4643. FCRA. Expert report. Deposition.

Anthony & Alethea Preston v. MGIC, U.S. District Court for the Middle District of Florida (Ocala), Case No. 5:03-cv-111-Oc-10GRJ. FCRA. Expert report, deposition.

Bruce Butcher and Pam Butcher v. Chase Manhattan Bank. U.S.A., Inc., U.S. District Court for District of South Carolina, Case No. 8:03-3184-26. FCRA. Expert report, deposition.

Karen Nienaber, et al. v.Citibank (South Dakota) N.A..: U.S. District Court for the District of South Dakota [Southern Div.}; Civ. No. CIV 04-4054. Declaration relied upon by court in settlement hearing.


## FEE

My fee is $250 per hour for preparation and for consulting; $300 per hour, or a minimum of $1,200 per day, for deposition or trial testimony, plus reasonable travel time, plus travel costs and expenses.

**MATERIALS CONSIDERED**

In specific preparation for this case, I have reviewed the following:

Plaintiffs' Complaint
Plaintiffs' credit reports
Various correspondences by Plaintiff & Defendants
Bate-stamped documents produced by Defendants & Plaintiff
Defendants' and Plaintiff's Answers & Disclosures

I also generally rely upon:

The Fair Credit Reporting Act & Consumer Credit Reporting Reform Act of 1996
Fair Credit Reporting Act (w/ Companion Disk & 2000 Cumulative Supplement,
National Consumer Law Center, 1998 (Boston)
Credit Scores and Credit Reports: How The System Really Works, What You Can
Do (3rd Edition, Privacy Times 2007),

My opinions in this case are also based on my 31-year profession of following privacy developments including those relating to the consumer reporting and information broker industry and the criminal justice system as a journalist, editor, publisher and privacy expert. My experience includes listening to and participating in dozens of hours of Congressional testimony, hearings before the Federal Trade Commission, media coverage, studies by independent groups, my own personal observations and numerous contacts, and my previous work preparing to be an expert witness in other FCRA cases.

**Executed This The 10th Day of August 2011 in Bethesda, Maryland**

/s/ Evan D. Hendricks
**Evan D. Hendricks**
PO Box 302
Cabin John, MD 20818
(301) 229 7002

36